# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MEGAN FOX and BRIDGET MCMAHON, on behalf of themselves and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> CHIPOTLE MEXICAN GRILL, INC., t/d/b/a CHIPOTLE, <br><br> Defendant. | CIVIL ACTION <br><br> No. 2:20-cv-01448-WSS <br><br><br> **FILED UNDER SEAL PURSUANT TO COURT ORDER** |

## PLAINTIFFS' MOTION TO COMPEL DISCOVERY RESPONSES

NOW COME Plaintiffs, Megan Fox and Bridget McMahon, on behalf of themselves and all others similarly situated, and through their undersigned counsel move this Honorable Court to compel Defendant Chipotle Mexican Grill, Inc., t/d/b/a Chipotle, to provide full and complete responses to Plaintiffs' Discovery Requests, upon the following grounds:

## INTRODUCTION AND STANDARDS

1. This Motion asks the Court to compel Defendant Chipotle Mexican Grill, Inc. ("Chipotle") to answer discovery requests and produce data and documents (in Chipotle's exclusive possession) which would adequately and significantly enhance Plaintiffs' ability to identify class members, the size of the class, and the scope of Chipotle's transgressions.

2. In addition, this Motion seeks to compel Chipotle to specifically identify employees or former employees who are likely to have information concerning

Chipotle's common policies and directives relevant to the causes of action raised in the Class Action Complaint.

3. The grounds for this Motion have been discussed with Chipotle by letter dated September 3, 2021, and at telephonic status conferences held on July 19, 2021 and October 5, 2021 pursuant to Section III.A. of this Court's Practices and Procedures. Chipotle continues to object to the discovery.

4. A party objecting to discovery has the burden of explaining why the requests are disproportionately burdensome or fun afoul of Rule 26, since the objecting party is in a better position to address the cost and time needed to respond. *E.g.*, *Kokinda v. Pa. Department of Corrections*, No. 2:16-cv-0005, U.S. LEXIS 24615, at *5 (W.D. Pa. 2018)(person objecting to discovery must explain with specificity why the discovery is inappropriate); *State Farm Mutual Insurance Company v. Pointe Physical Therapy, LLC*, 255 F. Supp. 3d 700, 705 (E.D. Mich. 2017).

5. Conclusory and unsupported statements by the objecting party should be rejected outright. *E.g.*, *Martinez v. City of New York*, 2017 WL 6403512, at *1 (E.D. N.Y. Dec. 14, 2017); *Cratty v. City of Wyandotte*, 2017 WL 5589583, *3 (E.D. Mich. Nov. 8, 2017) ("a party objecting to a request for production of documents as burdensome **must submit affidavits or other evidence** to substantiate its objections").

6. Likewise, boilerplate objections, including those relating to relevance, should not be considered. *Arrow Entertainment v. BlueAlly, LLC*, 2016 WL 4287929, at *3 (E.D. N.C. Aug. 15, 2016) (an appropriate objection must contain sufficient information to allow the court and requesting party to determine the validity of the objection). If Defendant objects because the requested information is not relevant, it must specifically prove "that the requested materials do not fall 'within the broad scope

of relevance … or else are of such marginal relevance that the potential harm occasioned by discovery would outweigh the ordinary presumption in favor of broad disclosure….” *Carter v. Baumcratz*, No. 1:18-cv-00096, U.S. Dist. LEXIS 24615, at *3-4 (W.D. Pa. 2019) (citing *Burke v. New York City Police Dep't*, 115 F.R.D. 220, 224 (S.D.N.Y. 1987).

7. In *Stiffler v. Black & Decker MFG. Co.*, this Court further defined the concept of relevance in discovery by stating that discovery "should ordinarily be allowed …unless it is clear that the information sought can have no possible bearing upon the subject matter of the suit…the scope of the examination should not be curtailed unless the information sought is clearly irrelevant." *Stiffler v. Black & Decker MFG. Co.*, 1981 U.S. Dist. LEXIS 12094, at *5-6 (W.D. Pa. April 6, 1981) (citing Roesberg v. Johns-Manville Corp, 85 F.R.D. 292 (E.D. PA. 1980)). Chipotle has failed to meet this burden.

## THE WRITTEN DISCOVERY REQUESTS

8. On or about August 31, 2020, Plaintiffs served their First Set of Discovery Requests on Chipotle.[1]

9. On or about June 25, 2021, Chipotle served Responses and Objections to Plaintiffs' written discovery. A copy of those Responses and Objections is attached hereto as **Exhibit 1**.

10. Plaintiffs sent a deficiency letter to Chipotle on September 3, 2021, and Chipotle responded on September 17, 2021. The deficiency letter and response are attached hereto as **Exhibits 2 and 3**, respectively.

---

[1] These Requests were properly served prior to Chipotle's removal of the case from the Court of Common Pleas of Allegheny County. Following this Court's denial of Plaintiffs' Motion to Remand, and despite Defendant's current objection on the ground that "it is unclear whether [the Requests are] served under Federal Rule 33 or 34," Chipotle agreed to respond to the Requests without the need to re-serve them.

11. Chipotle's objections fall into two general categories: Refusal to identify persons and processes and refusal to produce data.

**Refusal To Identify**

12. At the status conference held on July 19, 2021, in advance of mediation, defense counsel represented to the Court that it would be unduly burdensome for Chipotle to identify Reward Members who made cash purchases during the defined class period, because Chipotle would need to manually review each of the account records to make that determination.

13. In addition, although Chipotle acknowledges that at least a customer's name, phone number, and form of payment is stored in Chipotle's ▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, it claims that it "cannot specifically identify the number of [Rewards program] participants…who live in the state of Pennsylvania," and refuses to provide identification because "there is no way from the information…maintained by Chipotle to determine whether an individual making a cash purchase on a Rewards account did not receive the proper amount of change." *See* Paragraph 6 of Chipotle's September 17, 2021 response to Plaintiffs' deficiency letter, attached hereto as **Exhibit 3.**

14. Chipotle provided no affidavit or other evidence to support its allegations.

15. Chipotle's objections are belied by its own records. **Exhibit 4**, which Chipotle introduced at the deposition of Bridget McMahon, provides a glimpse into the extensive data available to Defendant. Although Chipotle refuses to provide a complete data dictionary of headings, at minimum **Exhibit 4** shows that the following information is available:



**Exhibit 3** attached hereto.

16. Although the amount of the cash tender was not identified on this particular customized form, it is believed and therefore averred that the dollar amount of each sale is maintained by Chipotle, because a customer accumulates 10 Reward points for each dollar spent. www.chipotle.com/rewards. Thus, the tender amount associated with a transaction must be captured by Chipotle to facilitate the awarding of such points.

17. While Chipotle cleverly attempts to divert attention by arguing that it cannot identify where customers live,[2] it misses the point. A class member is anyone who pays cash at a Pennsylvania Chipotle store and is short-changed as a result. The member's state of residence is not particularly relevant – as (for example) a person living in West Virginia or New Jersey who crosses the Pennsylvania border for lunch could still have been short-changed in Pennsylvania.

18. The affidavit of Matthew E. Pohl (**Exhibit 5**, referenced in greater detail below) makes it clear that access to any data in Chipotle's ▮▮▮▮▮▮▮▮▮▮ not burdensome, particularly for the multi-billion dollar corporation that created and thrives on that marketing platform, and can be used to determine both the number and

---

[2] Although even this appears to be false because it captures a member's phone number (including area code) and can identify a customer by a data category named '▮▮▮▮▮▮▮▮▮

identity of cash paying customers, which can, in turn, be reasonably calculated to lead to the discovery of admissible evidence that those customers were short-changed.

19. If one takes at face value that Chipotle's coin policy was <u>either</u> "don't take cash," or "exact change only," then any receipt which shows "change due" would show a transaction where the change was not returned. If the purchaser was a Rewards Member, then that person can be identified with sufficient specificity to allow Plaintiffs to determine – in the first instance – whether that customer is a potential class member. They can then make additional inquiry, if necessary, to determine whether Chipotle failed or refused to provide correct change.

20. For Chipotle to take the position that "you can't prove someone was short-changed" by hiding the ball (in its exclusive possession) again misses the point and is disingenuous. While Chipotle pays lip service to a distinction between certification and merits discovery, it conveniently ignores that distinction by conflating those concepts for its own benefit. "That's for us to know, and for you to find out," is not a proper basis for objection.

21. **Request 3** asks Chipotle to identify each and every complaint made to Chipotle about its failure to provide correct change.

22. While Chipotle does provide documents relating to approximately 30 direct written complaints made to Chipotle,[3] it redacts information which (a) allows identification of potential class members who suffered an ascertainable loss under the UTPCPL or otherwise, and (b) obscures the identity of Chipotle employees who

---

[3] Arguably enough to constitute a class by itself, but also indicative of a practice or policy affecting those who did not (or could not) write to Chipotle.

engaged with complaining customers and may thus have relevant information. *See* examples attached as **Exhibit 6**.

23. Chipotle contends, without authority, that "Identities of and contact information for putative class members is not generally a proper subject of class certification discovery." *See* Paragraph 3 of **Exhibit 3.** This conclusion is incorrect. Whether a class should be certified could be based, for example, on whether questions of law or fact are common to the class, whether the party opposing the class has acted on grounds that apply generally to the class, and whether questions of law or fact predominate over individual questions. *E.g.*, F.R.C.P. 23(a)(2), (b)(2) and (3). The ability of Plaintiffs' counsel to inquire of its own clients[4] should not be hampered by Chipotle's refusal to provide relevant identifying information which is in its exclusive possession.

24. Nor should Chipotle be allowed to obscure the identity of its <u>own</u> employees who interact with class members based on an unsubstantiated assumption that counsel would not act properly toward these employees. *See* Paragraph 3 of **Exhibit 3.** Offense to the implication aside, Plaintiffs' counsel should be able to obtain discovery from Chipotle employees who were – in all likelihood – acting at corporate direction, and would have information about Chipotle's change-handling policies (*e.g.*, whether Chipotle acted on grounds that applied generally to the class).

**Refusal To Produce Data**

25. Requests 5, 6, and 8-21 focus on obtaining information related to data in Chipotle's Corporate Computer Systems.

---

[4] *Bell v. Beneficial Consumer Discount Company*, 465 Pa. 225, 348 A.2d 734 (1975).

26. The information contained in these Systems is relevant and reasonably calculated to lead to the discovery of admissible evidence:

- First, the data (which is in Chipotle's exclusive possession) will significantly enhance Plaintiffs' ability to identify the potential <u>number of class members</u>, as well as the <u>identity</u> of Pennsylvania cash customers whose receipts show "change due," but not returned per Chipotle's corporate "coin shortage" policy and practice.

- Second, the data would allow Plaintiffs to discover the potential number of <u>transactions</u> that will be subject to class claims – including their UTPCPL claims.

27. While refusing to provide access, Chipotle's discovery responses identify at least three Corporate Computer Systems:

- A loyalty program called "Chipotle Rewards" (*e.g.*, response to Request 8);

- A Point-of-Sale ("POS") system called "Aloha" (*e.g.*, responses to Request 5 and 9); and

- An Enterprise Data Warehouse (*e.g.*, response to Request 10).

28. Chipotle objects to the production of, and access to, its data systems by conclusory and unsupported claims relating to burden and relevance. It does not provide evidence or an affidavit supporting its objections, and thus fails to meet its initial burden.

29. In contrast, Plaintiffs submit the affidavit of Matthew E. Pohl, attached hereto as **Exhibit 5**, which identifies in detail how the information believed to be contained in Chipotle's computer information systems would allow Plaintiffs to support their class certification allegations, as well as subsequent liability and damage analyses.

30. Moreover, Mr. Pohl – an established class action administrator and data expert – identifies a process that virtually eliminates any claimed "burden" by Chipotle,

because Mr. Pohl and his staff, subject to the Confidentiality Agreement signed between the parties, would be able to extract data from Chipotle's systems, and subsequently analyze the data for purposes of this lawsuit.

31. Indeed, Chipotle's own deposition exhibit, which is attached hereto as **Exhibit 4**, shows the ease by which data can be extracted. Contrary to Chipotle counsel's verbal representation (during the July 19, 2021, court conference) that Chipotle would be required to essentially undertake a manual review of its Rewards system for each reward member, **Exhibit 4** clearly demonstrates that the data maintained by Chipotle could easily be searched to extract, for example:



32. It is believed and therefore averred that this system would also include the amount of the cash purchase (which would in turn allow identification of potential short-change transactions). However, while acknowledging that data is available in its ▮▮▮▮▮▮▮▮▮▮ (*see* **Exhibit 1**, Response 8), Chipotle refuses to provide even the "data dictionary" (*i.e.*, definitions of each column within each table—a container o similar types of data) for each Corporate Computer System to allow Plaintiffs' data expert to determine which categories of retained data could assist in identifying class transactions.

33. Therefore, Chipotle should be compelled, at minimum, to make the data requested by Plaintiffs available for review and analysis by Plaintiffs' data expert under

---

[5] While not attached hereto, Chipotle introduced actual video of the transaction identified in Plaintiff Bridget McMahon's Complaint. This demonstrates that Chipotle is able to identify, preserve, and produce cash register video for any transaction, which can be used to determine, for example, whether Chipotle's representation that it did not have coins to return to the customer was true or false.

reasonable parameters designed to protect the proprietary nature of Chipotle's data collection process.

34. With respect to specific Requests:

(a) **Requests 5 and 6** seek information on how cash drawer overages and underages are recorded and reported at Chipotle. The relevance of the information is obvious. If Chipotle's POS system shows, for example, that a cash register started a shift with $100, that sales for the shift total $1,000.$^{00}$, but that the POS shows an extra $300.$^{00}$ in the register at the end of a shift, that is probative on the issue of whether or not consumers were short-changed. Defendant's objection based on "the <u>potentially</u> false factual assumption" that overages are recorded or reported, is a non-response. Chipotle knows whether or not overages are recorded and/or reported. Indeed, its Response <u>admits</u> that store managers enter deposits and amounts into the POS system. Yet it refuses to allow access to that system or related data. Claiming that Chipotle does not maintain historical information *as such* should not prevent Plaintiffs' data expert from testing that conclusion and determining whether overage information can be extracted. Indeed, publicly available social media postings (by what appear to be Chipotle employees) suggest that reporting an overage or underage in the cash drawer might submit Chipotle employees to disciplinary action – which in turn suggests that Chipotle oversees that data. *See* **Exhibit 7** attached hereto**.**

(b) **Request 8** seeks details on whether (and how) a sales transaction is linked to a customer's identity, and where the information is stored. Chipotle admits that each consumer ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ It further admits that certain information is "included," but does not identify all categories stores, and subsequently (in later responses, such as responses to **Requests 15, 16, and 19**), refuses to provide access to the data. Chipotle's objection on the basis that there is "no allegation or claim" which specifically mentions the Rewards program in the Complaint is not valid. Even if that program is not mentioned, it exists as a vehicle through which Plaintiffs can pierce through Chipotle's position, and allows Plaintiffs to identify, initially, how many cash transactions are potentially subject to Chipotle's improper conduct. It also

- permits Plaintiffs to further investigate whether Chipotle's conduct was (as Defendant claims) a series of isolated incidents or (as Plaintiffs claim) part of a corporate policy.

    (c) **Request 10** asks Chipotle to simply identify what data is **available** with respect to each sales transaction at Chipotle. Defendant generically sets forth some of the information "included," but does not indicate that the list is all-inclusive. Chipotle acknowledges that the information (whatever it may be) is stored ███████████████████████████████████ ██████████ but later refuses to provide access to that data. *See* response to **Requests 13-19**.

    (d) **Requests 13 and 14** simply seek the number of sales transactions and dollar volume of Pennsylvania sales from January 1, 2020 to the present.[6] Chipotle makes a blanket objection (even as related to cash sales), then contends that there is "no factual basis for Plaintiffs to request this information going back to January 1, 2020." However, it is not up to Defendant to unilaterally define the time frame of its short-change policy. January 1, 2020 is a reasonable starting point which allows Plaintiffs to determine (or confirm) when Chipotle began to short-change customers. It also allows Plaintiffs and their data expert the opportunity to compare historical data to current data. For example, if a review of the data shows that cash overages increased 150% after Chipotle implemented its "no change" policy, that would be relevant to Plaintiffs' claims of conversion.

    (e) Chipotle objects to **Request 17** on the ground that historical information on the percentage of sales involving cash tenders is overly broad. As noted above, historical data is relevant. Moreover, the Request is not burdensome, as it involves a simple calculation that can easily be accomplished (and likely already exists) through application of a search request to the ████████████████████. At absolute minimum, a response for 2020 to the present should be required, or access to the data should be given to Plaintiffs' experts so that they can obtain the information directly.

---

[6] Following this Court's observations during the July 19, 2021 status conference, and in advance of a mediation session, Defendant provided raw numbers for cash transactions (i.e., total number and dollar volume) for May, 2020 to December, 2020. Thus it is clear that such data is available and accessible. Nothing has been provided for January-April, 2020, or for any month in 2021.

(f) Chipotle refuses to provide data regarding daily overages/underages in its Pennsylvania cash drawers from January 1, 2020 to the present. *See* response to **Request 18**. It contends that "overages or shorts…may occur for a wide variety of reasons that do not have anything to do with the conduct alleged in the Complaint." Whether this is ultimately true or not, Plaintiffs are entitled to test Chipotle's conclusion, which includes the ability to take further discovery to determine whether (and how much) of the overages "have anything to do" with the allegations in the Complaint. Chipotle should not be allowed to avoid discovery on the basis of its own unsubstantiated factual allegations.

(g) **Request 19** requests production (or at least access) to Chipotle's transaction data from January 1, 2020 to the present. As noted above, and in the affidavit of Matthew E. Pohl, the data is relevant, the Request is proportionate to the needs of the case (especially since Chipotle has exclusive possession of that data), and the burden to Chipotle is minimized by providing access (with supervision) to Mr. Pohl and his company.

WHEREFORE, Plaintiffs, Megan Fox and Bridget McMahon, on behalf of themselves and all others similarly situated, respectfully move this Honorable Court to overrule Defendant's objections, and to enter an Order compelling Defendant Chipotle to provide full and complete responses to Plaintiffs' First Set of Discovery Requests as set forth in the attached proposed order, or to suffer further sanctions.

Respectfully submitted,

ROTHMAN GORDON, P.C.

By: /s/ Frank G. Salpietro
    Frank G. Salpietro, Esquire
    Pa. I.D. No. 47154

310 Grant Street – Third Floor
Pittsburgh, PA 15219
(412) 338-1185 (telephone)
(412) 246-1785 (facsimile)
fgsalpietro@rothmangordon.com

Attorneys for Plaintiffs

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the within Plaintiffs' Motion to Compel Discovery Responses has been served upon Defendant's counsel of record set forth below via the Court's electronic ECF System this 14th day of October, 2021:

Lindsey Conrad Kennedy, Esquire
Eckert Seamans Cherin & Mellott, LLC
600 Grant Street – 44th Floor
Pittsburgh, PA 15219

Elizabeth Bulat Turner, Esquire
Robert J. Mollohan, Jr., Esquire
Martenson, Hasbrouck, & Simon LLP
2573 Apple Valley Road NE
Atlanta, GA 30319

ROTHMAN GORDON, P.C.

By: /s/ Frank G. Salpietro
    Frank G. Salpietro, Esquire
    Attorneys for Plaintiffs