**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| BRIDGET MCMAHON and JAMES RICE, on behalf of themselves and all others similarly situated,<br><br>                Plaintiffs,<br><br>     v.<br><br>CHIPOTLE MEXICAN GRILL, INC., t/d/b/a CHIPOTLE,<br><br>                Defendant. | CIVIL ACTION NO. 2:20-cv-01448-WSS |

## DEFENDANT'S MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGEMENT

## INTRODUCTION

Defendant Chipotle Mexican Grill, Inc. ("Chipotle") operates a nationwide chain of fast-casual Mexican restaurants. Plaintiffs each bought food from Chipotle restaurants in Pennsylvania in 2020 (during an unprecedented time of crisis, confusion, and disruption from the COVID-19 pandemic). They used cash, but did not receive $0.49 and $0.45 in coin change from their cashiers. Without evidence, they accuse Chipotle of knowingly and deliberately directing or allowing employees to impose on cash-paying customers a "top-down" policy to steal coin change.

In reality, this lawsuit is the byproduct of (1) pandemic-driven nationwide coin shortage; and (2) Plaintiffs' counsel's opportunistic attempt to manufacture a class action based on its effects. During the pandemic (and subsequent crippling of the economy), the nation experienced an unexpected coin shortage.[1] Like countless other businesses across the nation, Chipotle required impacted stores to inform customers—orally and via posted company-provided signage—that only

---

[1] *E.g.*, Ian Richardson, *Fact check: Yes, there's a national coin shortage. Here's why,* USA Today (July 21, 2020).

exact change could temporarily be accepted for cash payments. If a customer was allowed to pay in cash (but not exact change) and did not receive correct coin change, such incident was contrary to company policy and effectuated with the customer's full knowing and voluntary consent, if not their insistence ("keep the change").

In early August 2020, Plaintiffs' counsel propositioned his daughter and her friends to intentionally make cash purchases from affected Chipotle restaurants without exact change so he could pursue a class action lawsuit. After this Court denied class certification, Plaintiffs proceed on individual claims of allegedly not receiving $0.49 and $0.45 in purchases in 2020. However, there is no evidence that Chipotle withheld coin change without Plaintiffs' consent or in violation of any law or contract. Summary judgment on these claims is warranted and proper.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

### A. Chipotle's Response to an Unprecedented Nationwide Coin Shortage.

Chipotle owns and operates a chain of "fast casual" Mexican restaurants, including, currently, 118 restaurants in Pennsylvania.[2] (Doc. 1-1 ¶ 3.) In response to a nationwide coin shortage from the COVID-19 pandemic, Chipotle implemented a policy that restaurants that ran low on or out of coins at any point should notify customers orally and via signage on restaurant service lines that only exact change could temporarily be accepted for *cash* payments; other *non-cash* forms of payment remained acceptable. (*See* Ex. 1, Rest. Commc'n.) Chipotle first disseminated this policy and signage on June 24, 2020.[3] (*Id.*) Chipotle employees were trained and given specific instruction on the policies. (*E.g.*, *id.*; Ex. 2, Grant Dep. 119:2–12; Ex. 3, Winschel Dep. 17:5–16, 17:20–24; 18:5–8, 19:4–22, 27:1–5.)

---

[2] *Chipotle Mexican Grill Locations in PA*, https://locations.chipotle.com/pa (last accessed October 10, 2023).
[3] Some restaurants also posted this signage on the front door and other locations as well. Restaurants could remove it if and when their coin inventory issues were resolved. (Ex. 1.)

Chipotle repeatedly redistributed this lawful policy and provided updated signage and other support. (*See* Ex. 4, "ChipLinks" Video Tr.; Ex. 5, Excerpted Rest. Commc'ns; Ex. 6, Coin Shortage Signage.) It directed: (i) employees "should NEVER round a guest's bill," and (ii) if a guest communicated to "keep the change," employees were to "politely decline and say that [they] are not permitted to keep guests' change." (Ex. 5 at 2.) Accordingly, any incident where a customer was allowed to pay in cash (but not exact change) and did not receive correct coin change (even if they consented, asked, or insisted) was contrary to policy and effectuated with their full knowledge and voluntary consent. (*E.g.*, Ex. 7, Grant Decl. ¶¶ 7–8, 14.)

## B.  At Counsel's Direction, Plaintiff McMahon Bought Food Using Cash from Chipotle's Allison Park Restaurant Affected by the Coin Shortage.

Plaintiff McMahon is a longtime friend of Isabella Salpietro ("Isabella"), whose father is Plaintiffs' counsel. Before visiting Chipotle as alleged in the Complaint, Isabella sent a group iMessage chat from "Frank" requesting that her friends (including McMahon and former Plaintiff Megan Fox) purchase food from Chipotle and intentionally tender cash over the exact amount, knowing that the cashier may not be able to make correct change due to a shortage of coins:





(Ex. 8, Group iMessages; Ex. 9, Salpietro Dep. 25:17–22, 26:6–16, 28:21–24, 29:14–16, 29:24–25.)[4] McMahon then went to a Chipotle in Allison Park on August 18, 2020 to, as requested,

---

[4] Plaintiffs had not produced the above-cited messages as of McMahon's deposition on September 29, 2021 and lied about the origin of her purchase at Chipotle. McMahon failed to admit the plan was concocted at Isabella's father's request. In fact, she stated under oath only that she: (a) talked to Fox at some point more than two days before August 18, and (b) talked to Isabella who had asked her whether something like Fox's transaction had happened to her. (*Id.*

attempt to purchase food with inexact cash without receiving coin change. (Ex. 10, McMahon Dep. 33:18–21, 100:17–24.) Before this visit, McMahon purchased food from Chipotle roughly once per week, and, tellingly, in all previous purchases with her Chipotle Rewards account, she had never used cash. (*Id.* at 56:6–8, 63:23–64:3.)

McMahon and her boyfriend (Michael Clayton) each ordered a "burrito bowl" from the crew member at the beginning of the service line. (*Id.* at 23:12–14, 66:12–15.) This crew member asked if they planned to pay in cash (McMahon said yes), and the crew member said something in response that McMahon could not remember. (*Id.* at 70:25–71:11.) The two each selected various bases (*e.g.*, rice, beans, chicken, fajita vegetables) and toppings (*e.g.*, salsas, sour cream, guacamole, cheese, lettuce), and the crew member prepared their orders. (*Id.* at 72:24–73:2.) They then encountered restaurant manager Zachary Masi, who placed the bowls into a to-go bag and rang up the order on the point-of-sale ("POS") system. (Ex. 11, Allison Park Video; Doc. 102-1.) After McMahon scanned a "QR" code on her iPhone to register the purchase through Chipotle's Rewards loyalty platform, she tendered what appears to be a $20 bill. (Ex. 11; Ex. 10, McMahon Dep. 73:13–16, 83:4–7, 95:12–15.) Masi told her that, if she chose to pay with this bill, he could not provide her with any coin change. (Ex. 10, McMahon Dep. 73:13-16.) McMahon waved (to indicate that was fine), and Masi placed the bill inside the cash drawer, counted out a number of (likely) $1 bills, and handed them and a receipt to McMahon. (Ex. 11.) McMahon quickly folded the bills into the receipt and immediately walked out of the restaurant with Clayton and the bag. (*Id.*; Ex. 10, McMahon Dep. 95:24–96:3.) As she left, McMahon saw the coin policy signage on the restaurant door. (Ex. 10, McMahon Dep. 97:15–23.)

---

at 17:17–19:3.).) She further testified that she had exchanged text messages with Fox and Isabella but had not even looked for them before her deposition. (*Id.* at 19:4–21.) In reality, she had gone to Chipotle—and intentionally paid in inexact cash—at that very lawyer's request with full knowledge of the circumstances.

McMahon had other forms of payment in the back of her phone case, and she knew that she did not have to move forward with the transaction. (*Id.* at 68:4–9, 82:9–17, 76:19–22, 77:3–5.) She did not demand the return of any change, object to not being given the correct amount of change, demand a refund, or ask to speak with a manager. (*Id.* at 76:23–77:1, 77:11–16.) Afterwards, McMahon texted her friends (Isabella and Fox) about the purchase and ate her food. (*Id.* at 36:3–15, 94:3–4.) The next day, McMahon met with Isabella, then her father, and McMahon and Fox filed their class action complaint the day after that. (*Id.* at 35:8–12, 37:2–8, 38:1–7.)

### C. **Plaintiff Rice Later Bought Food Using Cash from Chipotle's Valley Square Restaurant Affected by the Coin Shortage.**

Plaintiff Rice went to Chipotle's Valley Square restaurant in Warrington on October 10, 2020. (Ex. 12, Rice Dep. 38:13–17; 40:1–4.) Rice was a regular at Chipotle, having eaten there at least 100 times in the previous year. (*Id.* at 48:3–8.) Chipotle is his favorite restaurant, and he does not even look at the menu, knows what he wants to order beforehand, and usually orders the same thing every time. (*Id.* at 80:12–81:1, 83:17–18.) Without looking up at the menu above and behind the service line, Rice ordered a burrito bowl from the crew member at the beginning of the service line and selected various bases and toppings. (Ex. 13–14, Valley Sq. Video; Ex. 12, Rice Dep. 51:22–23, 87:8–10.) Rice then proceeded to the cash register as another employee placed a lid on the bowl. (Ex. 13–14.) This employee then proceeded towards the cash register with Rice's order, retrieved a bottled water for Rice, and rang up the order on the POS system. (*Id.*) Rice scanned a Chipotle Rewards QR code on his phone as the employee placed his order into a to-go bag and then tendered a single bill to the employee. (Ex. 14; Ex. 12, Rice Dep. 53:14–17, 53:21-54:3.) The employee placed the bill inside the cash drawer, counted out a number of (likely) $1 bills, handed them to Rice, and placed a receipt in the bag. (Ex. 14.) Rice briefly reviewed the receipt and bills before folding them together and placing them in his pocket. (*Id.*) The cashier informed him that

she could not give him coins. (Ex. 12, Rice Dep. 54:9-10.) Rice repeated back what he heard from the cashier, who reportedly stated that she was only following the instruction of her manager. (*Id.* at 54:6–13, 56:9–14.) Rice remained in front of the register because he had requested an additional side in a portion cup. (Ex. 14.) Rice placed it in the bag and immediately walked out of the restaurant. (Ex. 14; Ex. 12, Rice Dep. 93:1–13.) He was not forced to go through with the transaction and never asked to speak with the manager, requested return of any change, or inquired about a refund.[5] (Ex. 12, Rice Dep. 56:15–20, 57:2-6, 61:5–6.)

### D. <u>Neither Plaintiff Alerts, Complains to, or Seeks Any Redress from Chipotle.</u>

Neither Plaintiff complained to Chipotle's Customer Support Department about the events of their purchases, as indicated to do on their receipts. (Doc. 102-1, 102-2.) McMahon certainly knew how: she had previously complained about a separate issue. (Ex. 10, McMahon Dep. 86:12–21.) Rice allegedly complained to the Pennsylvania Attorney General's Office (although he does not recall the substance). (Ex. 12, Rice Dep. 19:2–5, 24:20–23.) He then sought to intervene in this lawsuit before receiving any response.[6] (*Id.* at 24:2–9, 25:8–11; *see* Doc. 85.) Nevertheless, Plaintiffs continue to allege that Chipotle knowingly instituted or acquiesced in a policy or practice to withhold change from its customers. However, neither Plaintiff is aware of any facts supporting this allegation and can only testify about their own personal experiences. (Ex. 10, McMahon Dep. 89:17–25, 90:5–9, 98:5–12; Ex. 12, Rice Dep. 100:4–8, 102:2–6, 103:7–13, 105:12–19.)

### <u>ARGUMENT AND CITATION OF AUTHORITIES</u>

Federal courts must "grant summary judgment if the movant shows that there is no genuine

---

[5] At some point afterward, Plaintiff Rice allegedly visited a different Pennsylvania Chipotle, during which he alleges that he did not receive his coin change after paying in cash. (Ex. 12, Rice Dep. at 65:7–24, 70:25–71:4.) Similarly, he desired to proceed with his purchase anyway, was not forced to complete it, and did not ask to speak with a manager, request a refund, or complain to Chipotle. (*Id.* at 72:11–25, 73:1–5.) These allegations lack any detail that would allow Rice to establish any of his individual claims premised thereon, to the extent that he intends to assert any.

[6] Chipotle was unaware of Rice's complaint until after he joined the lawsuit and produced a communication from the Attorney General's Office during his deposition months later.

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[T]he moving party must affirmatively identify those portions of the record which demonstrate the absence of a genuine issue of material fact." *Rinker v. Amori*, 2016 WL 6879617, at *6 (M.D. Pa. Nov. 22, 2016). The non-moving party "must do more than simply show that there is some metaphysical doubt as to material facts," but must show sufficient evidence to support a verdict in its favor. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986). "[U]nsupported assertions, conclusory allegations, or mere suspicions" are insufficient. *Schaar v. Lehigh Valley Health Servs., Inc.*, 732 F. Supp. 2d 490, 493 (E.D. Pa. 2010). Plaintiffs cannot establish essential elements for their claims for conversion or misappropriation, violation of Pennsylvania's Unfair Trade Practices and Consumer Protection Law ("UTPCPL"), and "breach of contract/unjust enrichment." As a result, the Court should grant summary judgment in Chipotle's favor.

## I. PLAINTIFFS' CLAIMS FOR "MISAPPROPRIATION AND CONVERSION" FAIL AS A MATTER OF LAW.

### A. Plaintiffs' Tort Claims Are Barred Because They Stem from a Contract.

As an initial matter, this Court has recognized that "under Pennsylvania law, 'a claim for conversion cannot stand when there is a contract between the parties that governs the same disputed funds … because the dispute is better handled as a breach of contract." *Hickey v. Univ. of Pittsburgh*, 535 F. Supp. 3d 372, 381 (W.D. Pa. 2021) (Stickman, J.) (rev'd in part on other grounds). The "gist of the action" doctrine bars tort claims: (1) arising solely from a contract between the parties, *Galdieri v. Monsanto Co.*, 245 F. Supp. 2d 636, 650 (E.D. Pa. 2002); (2) where the duties allegedly breached were created and grounded in the contract itself, *Werner Kammann Maschinefabrik, GmBH, v. Max Levy Autograph, Inc.*, 2002 WL 126634, at *6 (E.D. Pa. Jan 31, 2002); (3) where the liability stems from a contract, *Asbury Auto. Grp., LLC v. Chrysler Ins. Co.*, 2002 WL 15925, at *3 (E.D. Pa. Jan. 7, 2002); or (4) where the tort claim essentially duplicates a

breach of contract claim or its success is wholly dependent on the terms of a contract, *Polymer Dyns., Inc. v. Bayer Corp.*, 2000 WL 1146622, at \*6 (E.D. Pa. Aug 14, 2000).

Plaintiffs concede that the transactions at issue here amount to sales contracts. They generally allege that "Chipotle, by its actions, policies, or practices, as set forth above, breaches its agreement with its customers by collecting more for goods and services than the customers agreed to pay when ordering said goods and services." (Doc. 102, Am. Compl. ¶ 31.) Pennsylvania maintains a legislative scheme (its Uniform Commercial Code) governing contracts for sales of goods. 13 Pa. C.S. § 1101 *et seq.* Here, the alleged tortious conduct plainly duplicates Plaintiffs' underlying contract claims. Both Plaintiffs' alleged injuries—$0.49 and $0.45—arise solely from their transactions for sales of goods under the UCC. Accordingly, "a breach of a duty [is] established, if at all, from a contract or warranty rather than a tort," and so the tort claims "essentially duplicate the breach of contract claims." *MRL Dev. I, LLC v. Whitecap Inv. Corp.*, 823 F.3d 195, 207–08 (3d Cir. 2016). Plaintiffs are precluded from asserting separate tort claims.

### B. <u>Plaintiffs Cannot Establish the Elements of Conversion or Misappropriation.</u>

Pennsylvania law defines "conversion" as "the deprivation of another's right of property in, or use or possession of, a chattel, without the owner's consent and without lawful justification." *Schulze v. Legg Mason Wood Walker, Inc.*, 865 F. Supp. 277, 284 (W.D. Pa. 1994) "A deliberate taking of another's personal property without consent is the strongest and clearest case of conversion." *Cenna v. United States*, 402 F.2d 168, 170–71 (3d Cir. 1968). The deliberate taking must have been done "with the intent of using it for another in conflict with that person's interest." *Id.* (citing *Gottesfeld v. Mechs. & Traders Ins. Co.*, 196 Pa. Super. 109, 115, 173 A.2d 763, 766 (1961)). Plaintiffs have failed and cannot present any evidence supporting or establishing their conversion and misappropriation claims as a matter of law.

### 1. There Is No Evidence of the Prerequisite "Demand and Refusal."

First, "demanding the return of personal property is an essential element of conversion." *Serafini v. Mariani*, 2010 WL 1342926, at *5 (M.D. Pa. Mar. 31, 2010). Thus, "'a cause of action for conversion does not accrue until there has been a demand for the goods and a refusal to deliver.'" *Id.* Importantly, under circumstances where "one lawfully comes into possession of a chattel, a conversion [only] occurs if a demand for the chattel is made by the rightful owner and the other party refuses to deliver." *Fenton v. Balick*, 821 F. Supp. 2d 755, 760 (E.D. Pa. 2011); *Avanti Wind Sys., Inc. v. Shattell*, 2016 WL 3211990, at *22 (W.D. Pa. June 9, 2016). Absent a demand for the goods and a subsequent refusal to deliver, a conversion has not occurred. *Serafini*, 2010 WL 1342926, at *5 (discussing *Dranoff v. Merrill Lynch,* 1986 WL 15014, at *2 (E.D. Pa. Dec. 31, 1986)). The same is true for misappropriation, which requires an improper taking *without permission*. *Sorbee Int'l Ltd. v. Chubb Custom Ins. Co.*, 735 A.2d 712, 717 (Pa. Super. 1999).

Plaintiffs do not even allege that they made a demand for return of any allegedly converted or misappropriated coin change, and both Plaintiffs testified that they did not. Although Rice inquired into not receiving his coinage, he did not subsequently demand return of any amount of his tender. (Ex. 12, Rice Dep. 58:6–14, 109:1–13, 110:1–3) Meanwhile, McMahon accepted the result without question. (Ex. 10, McMahon Dep. 95:16–25, 96:1–3.) Indeed, as evidenced by her prior communications with Salpietro and Fox, she intended to do just that all along. Accordingly, no claim for conversion or misappropriation of coin change has accrued.

### 2. Plaintiffs Cannot Establish Lack of Consent to Their Payments for Food from Chipotle, Which They Instead Made Voluntarily, Barring Their Claims.

As relevant to Plaintiffs' allegations, a conversion of chattel may be committed by dispossession or use exceeding authorization (whether in fact or by law). Restatement (2d) Torts §§ 223, 227–28, 231. However, *the absence of consent* is an element for which Plaintiffs

affirmatively bear the burden of proof. *McDonald v. Wells Fargo Bank, N.A.*, 374 F. Supp. 3d 462, 512 (W.D. Pa. 2019). Moreover, evidence of Plaintiffs' consent in this case is sufficient to dispense with these claims as a matter of law. As explained by the Eastern District of Pennsylvania:

> In this case, however, Plaintiff willingly turned over his chattel and this element of conversion cannot be satisfied. We understand that Plaintiff alleges fraudulent and misleading behavior on the part of Defendants, but these allegations do not negate the fact that Plaintiff consented to the transfer of the chattel.

*Lawn v. Enhanced Serv. Billing, Inc.*, 2010 WL 2773377, at *3 (E.D. Pa. July 13, 2010). "[T]he voluntary nature of Plaintiffs' payments defeats a claim for conversion. Even if [Chipotle] lacked authority to require the … payment, an allegation that [Chipotle] had no right to charge the fee is different from an allegation that Plaintiffs' money was taken without their consent." *Thomas v. Phila. Hous. Auth.*, 2011 WL 2415157, at *9 (E.D. Pa. June 15, 2011).

Here, the alleged deprivation of coin change did not occur (and could not have occurred) without Plaintiffs' consent to completing the transactions and their receiving the food they ordered. McMahon even had prior knowledge about the change issue at Chipotle from her counsel's daughter, and she wanted Chipotle to shortchange her and admittedly consented to it to lend her name to a class action. In both cases, Plaintiffs were made aware that the cashier was unable to provide them with complete coin change. Neither Plaintiff objected to not receiving it, requested to speak to a manager, or asked for a refund, as they both wished to proceed so that they could receive their food. (Ex. 10, McMahon Dep. 76:23–77:5, 77:11–16, 77:21–78:3; Ex. 12, Rice Dep. 57:15–25, 58:1-14, 60:2–14.) Thus, Plaintiffs consented, without any coercion, to receiving the specific amounts in change that they were given in exchange for their food. *See In re Booher*, 284 B.R. 191, 216 (Bankr. W.D. Pa. 2002) (approval constituted a ratification of an alleged conversion). Neither Plaintiff can refute the fact of their consent.

Similarly, Plaintiffs' claims also fail under the voluntary payment doctrine. Under

Pennsylvania law, "it is elementary that one who voluntarily pays money with full knowledge of the facts, without any fraud having been practiced upon him, cannot recover it back." *Coregis Ins. Co. v. L. Offs. of Carole F. Kafrissen, P.C.*, 140 F. Supp. 2d 461, 463 (E.D. Pa. 2001) (quoting *Ochiuto v. Prudential Ins. Co.,* 52 A.2d 228, 230 (Pa. 1947)). "The voluntary payment doctrine is a form of estoppel," under which "'one who has voluntarily paid money with full knowledge, or means of knowledge of all the facts, without any fraud having been practiced upon him … cannot recover it back by reason of the payment having been made under a mistake or error as to the applicable rules of law.'" *Webster v. LLR, Inc.*, 2018 WL 10230741, at *3 (W.D. Pa. Aug. 20, 2018) (quoting *Liss & Marion, P.C. v. Recordex Acquisition Corp.*, 983 A.2d 652, 661 (Pa. 2009)). This doctrine "flows from the principle that when a party knows it will resort to litigation over an allegedly unjust payment or demand, that party should take its position at the time of the demand, and litigate the issue before, rather than after, payment is made." *Zakheim v. Curb Mobility LLC*, 2023 WL 3898867, at *5 (E.D. Pa. June 8, 2023) (internal quotations omitted). The application of the doctrine, therefore, "depends on the premise that a party had sufficient opportunity to challenge a fee beforehand." *Id.* "In the absence of compulsion, fraud, mistake of fact, or an agreement between the parties at the time of payment that any excess will be repaid," a payor who voluntarily pays money with full knowledge of the facts is barred from recovery.

Both Plaintiffs here had: (i) full knowledge of the pertinent facts regarding the restaurants' respective shortages of coins, and (ii) a sufficient opportunity to avoid paying any excess amount. However, neither Plaintiff protested nor demonstrated any intent to "preserve the right to dispute the legality" of Chipotle's actions. *Zakheim*, 2023 WL 3898867, at *5. McMahon entered the restaurant with complete knowledge of the likely outcome of events when she deliberately sought to exploit the coin shortage: she was given an overview and specific instructions for her planned

transaction. (*See* Ex. 8.) Unsurprisingly, she proceeded with her transaction payment without any questions or objections. (Ex. 10, McMahon Dep. 76:19–77:5, 77:11–16, 77:21–78:3.) Rice, after asking the cashier why he did not receive his coinage, accepted his bills and left the store with his food. Not only did he not demand a return of any amount of his tender, but he also did not ask additional questions or make any protests about it. (Ex. 12, Rice Dep. 57:15–25, 58:1–15.) Thus, both Plaintiffs proceeded with their payments and purchases voluntarily, with full knowledge of the prospect that the restaurant could not provide them with complete coin change and without any duress or fraud, so that they could obtain their food and continue on with their day, which they did.

### 3. Plaintiffs Cannot Show an Unreasonable Interference with Their Property Amounting to Conversion.

Finally, "Pennsylvania law clarifies that withholding possession of goods is only an act of conversion if done *unreasonably* and *after* the owner has made a demand for them." *Win & Son, Inc. v. City of Phila.*, 178 F. Supp. 3d 234, 243 (E.D. Pa. 2016) (emphases added). The deprivation of possession, on its own, does not give rise to conversion; instead, there must be an "actual appropriation of the property by the offending party for his own use." *Id.* The actor's good faith, the extent of the interference, and the resulting harm are among the factors in determining potential liability for conversion. *PTSI, Inc. v. Haley*, 71 A.3d 304, 314 (Pa. Super. 2013) (citing Restatement (2d) Torts § 222A (1965)); *see Heaven v. Portfolio Recovery Assocs., LLC*, 303 F. Supp. 3d 333, 342 (E.D. Pa. 2018) (summary judgment evidence clearly established that bank did not act unreasonably and acted in good faith and with lawful justification when disbursing account funds).

When a customer tenders cash to pay for a purchase, the cashier is lawfully in possession of the tender while processing the transaction. *See Univ. Comp. Sys., Inc. v. Allegheny Airlines, Inc.*, 479 F. Supp. 639, 645 (M.D. Pa. 1979), *aff'd*, 622 F.2d 579 (3d Cir. 1980). So, only a use of the tender that exceeds the limits of the authorization—here, of a Chipotle cashier as a bailee—

may result in a conversion. Restatement (2d) Torts § 228 cmt. b. "The limits of the permitted use ordinarily are determined by the terms, express or reasonably to be implied, of the contract or other agreement between the parties, and the question becomes one of whether there is a material breach of the agreement." *Id.* § 228 cmt. c. Moreover, an agent or servant who receives money or a negotiable instrument on behalf of a principal or master in consummation of a transaction is not subject to liability for conversion. *Id.* § 231(1), (4) & cmt. c.

There is no evidence in this case that Chipotle unreasonably interfered with any money of Plaintiffs. First, when Chipotle cashiers possessed Plaintiffs' tenders, the evidence indicates only that Plaintiffs and the cashiers were then discussing that Plaintiffs could not be provided correct coin change (due to the coin shortage). Second, these Chipotle employees could not have unreasonably withheld Plaintiffs' tender or coin change (again, which neither Plaintiff demanded be returned) *after* Plaintiffs demonstrated consent to continue and complete the transactions using cash and subsequently left the premises with their food. Therefore, Plaintiffs cannot demonstrate an unreasonable interference with their property (either before or after they relinquished any right to it). Therefore, Plaintiffs' conversion and misappropriation claims fail on multiple grounds.

## II.   PLAINTIFFS' CLAIMS UNDER THE PENNSYLVANIA UTPCPL FAIL AS A MATTER OF LAW.

As private plaintiffs suing under Pennsylvania's UTPCPL, Plaintiffs must demonstrate, *inter alia*, that "the defendant was engaged in unfair methods of competition and unfair or deceptive acts or practices." *Fazio v. Guardian Life Ins. Co. of Am.*, 62 A.3d 396, 409 (Pa. Super. 2012) (internal quotations omitted). They must also establish an ascertainable loss as a direct result of justifiably relying on the defendant's allegedly unfair or deceptive conduct. *Hunt v. U.S. Tobacco Co.*, 538 F.3d 217, 226 (3d Cir. 2008). Accordingly, Plaintiffs' UTPCPL claims require proof of: (1) an act or practice prohibited by the statute; (2) justifiable reliance on the

representation or conduct; and (3) causation of an ascertainable loss by such justifiable reliance. *Kerr v. State Farm Mut. Auto. Ins. Co.*, 2018 WL 5809989, at *5 (W.D. Pa. Nov. 6, 2018).

### A. Plaintiffs Cannot Establish That Chipotle Engaged in Fraudulent, Unfair, or Deceptive Conduct.

Plaintiffs allege that Chipotle violated UTPCPL subsections 201-2(4)(ix) and (xxi). Subsection (ix) prohibits "[a]dvertising goods or services with intent not to sell them as advertised," for which Plaintiffs must show that "(1) a defendant's representation is false; (2) it actually deceives or has a tendency to deceive; and (3) the representation is likely to make a difference in the purchasing decision." *Corsale v. Sperian Energy Corp.*, 412 F. Supp. 3d 556, 562 (W.D. Pa. 2019) (internal quotations omitted). Subsection (xxi) prohibits "[e]ngaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding," for which Plaintiffs must show that Chipotle "committed a deceptive act that is likely to deceive a consumer acting reasonably under similar circumstances." *Kerr*, 2018 WL 5809989, at *5.

Here, Plaintiffs are unable to point to evidence showing Chipotle engaged in any deceptive conduct. Initially, Plaintiffs cannot settle on what specific act of Chipotle or which portion of the transaction constituted a deceptive act, and instead open-endedly and generally allege that Chipotle violated the UTPCPL in numerous ways. (Doc. 102, Am. Compl. ¶ 26(a)–(e).) Even then, none of the evidence on these allegations reflects how any conduct of Chipotle was likely to deceive a consumer acting reasonably under similar circumstances. Rice testified to not recalling seeing any payment-related signage posted at the Chipotle restaurant he visited, but McMahon saw such signage posted on the door of the Chipotle she visited (albeit after she left, without articulating any reason she could not see it when arriving). (*See* Ex. 10, McMahon Dep. 42:10–13, 45:2–7, 66:19–21; Ex. 12, Rice Dep. 97:15–23.) In both cases, it is undisputed that both Plaintiffs were specifically informed—before they completed their transactions, accepted their food, and walked

out of a Chipotle restaurant—that the cashier was unable to provide them with complete coin change. (Ex. 10, McMahon Dep. 73:13–16; Ex. 12, Rice Dep. 54:1–13, 56:9–20.) Both Plaintiffs also acknowledged that they had credit or debit cards on their persons during the transactions. (Ex. 10, McMahon Dep. 67:19–24, 68:4–9, 80:4–6; Ex. 12, Rice Dep. 41:14–42:3, 56:6-8.) Both Plaintiffs also understood that at no point were they forced to use cash as payment or complete the transactions at all. (Ex. 10, McMahon Dep. 76:19–22; Ex. 12, Rice Dep. 57:2–4.) Thus, under these circumstances and with these understandings, no reasonable person would have felt deceived into thinking the opposite. Therefore, Plaintiffs fail to demonstrate Chipotle deceptively acted in a manner that was likely to deceive a consumer acting reasonably under similar circumstances.

### B. **Plaintiffs Are Unable to Demonstrate Justifiable Reliance or That It Directly Caused Them an Ascertainable Loss.**

Plaintiffs' claims also fail because they have not alleged that they justifiably relied on any false representations by Chipotle when purchasing their food. A private UTPCPL plaintiff "must show that he justifiably relied on the defendant's wrongful conduct or representation and that he suffered harm as a result of that reliance." *Slapikas v. First Am. Title Ins. Co.*, 298 F.R.D. 285, 292 (W.D. Pa. 2014). Plaintiffs must prove these elements "affirmatively." *Hunt*, 538 F.3d at 227; *see Gregg v. Ameriprise Fin., Inc.*, 245 A.3d 637, 644 (Pa. 2021) ("In a private action … reliance and causation are required."). "Evidence of reliance must go beyond simply a causal connection between the misrepresentation and the harm" *Slapikas,* 298 F.R.D. 292 (W.D. Pa. 2014) (quoting *Slemmer v. McGlaughlin Spray Foam Insulation, Inc.,* 2013 WL 3380590, at *6 (E.D. Pa. July 8, 2013). This showing "requires proof that the plaintiff justifiably bought the product in the first place (or engaged in some other detrimental activity) because of the misrepresentation." *Chandler v. L'Oreal USA, Inc.*, 340 F. Supp. 3d 551, 567–68 (W.D. Pa. 2018), *aff'd*, 774 F. App'x 752 (3d Cir. 2019). For their false advertising allegations, Plaintiffs must show "that [they] purchased [the

product] because [they] heard and believed [the company's] false advertising" about the product. *Weinberg v. Sun Co.*, 565 Pa. 612, 618, 777 A.2d 442, 446 (2001). Ultimately, Plaintiffs "must prove that they themselves were actually deceived and that the [alleged deceptive act] actually influenced their purchasing decisions." *Id.* at 445 (Pa. 2001). Because reliance and causation are required, the alleged misrepresentation must have occurred before the sale of the goods.[7] *See Neff v. PNC Bank, Nat'l Ass'n*, 2020 WL 838363, at *10 (Pa. Super. Feb. 20, 2020).

Here, Plaintiffs do not allege that they bought food from Chipotle because they heard and relied on *any* representations (false or otherwise) or that they were actually deceived in such a way that actually influenced their purchasing decisions. First, neither Plaintiff relied on Chipotle's menu pricing in their ordering and purchasing decisions—their deposition testimony confirms just the opposite. McMahon unquestionably had prior knowledge of the coin shortage issue before going to Chipotle and deliberately attempted to pay with inexact cash to receive incomplete change. "The recipient of an allegedly fraudulent misrepresentation … is not justified in relying upon [its] truth … if he knows it to be false or its falsity is obvious. This is because 'knowledge negates the affirmative element of reliance.'" *Plumbers' Loc. Union No. 690 Health Plan v. Apotex Corp.*, 2017 WL 4235773, at *7 (E.D. Pa. Sept. 25, 2017). Therefore, as a matter of law, McMahon could not have been deceived, misled, or confused. Rice, too, did not rely on or even reference the menu or prices when ordering, given his experience with Chipotle. (Ex. 12, Rice Dep. 51:22-52:1.)

With respect to any other specific alleged conduct of Chipotle, Plaintiffs cannot point to any evidence that they altered their behavior based on actually having been deceived or confused. It is undisputed that, after attempting to pay for their food with inexact cash in contravention of Chipotle's temporary policy, both Plaintiffs were specifically informed of the prospect that they

---

[7] For this reason, Plaintiffs could not have actually been deceived by any aspect of their receipts, received at the very end of their transactions. *See Hunt*, 538 F.3d 217, 222 (3d Cir. 2008).

might not receive coin change, and *before* they completed their transactions. Neither Plaintiff was forced to complete their transactions at that (or any other) point. Nor did either Plaintiff ever ask to speak with a manager, request a return of any amount of their cash tenders, or ask about receiving a refund. Instead, both Plaintiffs continued with and completed their transactions, took their food, and left the restaurants. Plaintiffs fail to demonstrate that they actually relied on any representation of Chipotle—justifiably or not—when making their purchasing decisions.

Moreover, neither Plaintiff can establish that their supposed reliance on any conduct by Chipotle directly caused them to suffer an "ascertainable loss." Chiefly, both Plaintiffs had other forms of payment (on their persons, no less) during their respective transactions. And, when ultimately informed that the cashiers could not provide complete coin change (due to the coin shortage), they retained the option to use a different form of payment, like a credit or debit card, to avoid any non-receipt of coin change. Thus, Plaintiffs' subsequent decisions to proceed with the transactions and insist on using cash, instead of any other payment, caused any miniscule "loss" of coin change. Since the evidence demonstrates that Plaintiffs cannot establish the elements of liability under the UTPCPL, their claims under that statute fail as a matter of law.

## III.   PLAINTIFFS' BREACH OF CONTRACT AND UNJUST ENRICHMENT CLAIMS FAIL AS A MATTER OF LAW.

### A.   Plaintiffs Fail to Establish Unjust Enrichment Claims, Which Do Not Lie in the Face of a Contract.

In their Complaint, Plaintiffs assert a claim for "Breach of Contract/Unjust Enrichment." First, "[u]njust enrichment is a quasi-contractual claim in which the contract at issue is implied in law, and not an actual contract at all." *Cosby v. Am. Media, Inc.,* 197 F. Supp. 3d 735, 744–45 (E.D. Pa. 2016). Consequently, the doctrine is inapplicable if the parties have a contract or agreement. *Id.* at 745; *e.g.*, *Matter of Penn Cent. Transp. Co.*, 831 F.2d (3d Cir. 1987). Further, an unjust enrichment "claimant must show that the party against whom recovery is sought either wrongfully

secured or passively received a benefit that would be *unconscionable* for the party to retain without compensating the provider." *Cosby*, 197 F. Supp. 3d at 744–45; *see SodexoMAGIC, LLC v. Drexel Univ.*, 24 F.4th 183, 229 (3d Cir. 2022) (requiring "acceptance and retention of … benefits under such circumstances that it would be inequitable"). If the benefit a party confers upon another also protects its own interest, there can be no inequitable or unjust result. *See id.*

Here, as Plaintiffs concede, a contract or agreement covered the subject matter of their respective purchases of food from Chipotle. Accordingly, no equitable relief under a quasi-contractual unjust enrichment theory is available as a matter of law. Even still, Plaintiffs' unjust enrichment claims "rise and fall" with their tort claims for conversion and misappropriation, which fail as well. S*teamfitters Local Union No. 420 Welfare Fund v. Philip Morris, Inc.*, 171 F.3d 912, 937 (3d Cir.1999) (dismissing unjust enrichment claim following dismissal of underlying traditional tort claims). Moreover, Plaintiffs must show that Chipotle wrongfully secured or received a benefit that is unconscionable to retain. But a claim for unjust enrichment is barred where the complaining party benefits in a way that protects their own interests as well. *Babich v. Karsnak,* 364 Pa. Super. 558, 528 A.2d 649, 652 (1987) (no unjust enrichment where plaintiff contributed money and services in order to advance his own interest).

Here, no evidence allows Plaintiffs to make these requisite showings. First, Plaintiffs were informed of the relevant circumstances and consented to proceed with their transactions anyway, so Chipotle's acceptance of their payments cannot be "unconscionable." Plaintiffs also testified, despite the circumstances, they decided to move forward because they still wanted their food. Specifically, Rice advanced his own interests by securing his lunch from one of his favorite restaurants, serving customers even during the pandemic. (Ex. 12, Rice Dep. 60:11–61:4.) McMahon also advanced her own interests by securing dinner for her and her boyfriend (also

during the pandemic) and heeding Isabella's recommendation to become a class representative in this case. (Ex. 10, McMahon Dep. 77:2-5; Ex. 8.) Any benefits Plaintiffs conferred upon Chipotle were incidental to pursuing their own interests, therefore prohibiting any form of unconscionability or inequitable circumstances. As such, Plaintiffs unjust enrichment claims fail as a matter of law.

**B. Plaintiffs' Breach of Contract Claims Fail on Both Procedural and Substantive Grounds.**

Lastly, Plaintiffs' breach of contract claims fail on multiple grounds. First, Pennsylvania's UCC governs the sales of goods. 13 Pa. C.S. § 1101 *et seq. Feingold v. Win-Vent, Inc.*, 562 A.2d 830, 831 (Pa. Super. 1989). The UCC requires that, after a buyer's "tender has been accepted … the buyer must within a reasonable time after he [or she] discovers or should have discovered any breach notify the seller of [the] breach..." 13 Pa. C.S. § 2607(c)(1). Absent this notification, the buyer is barred from any remedy. *Id.* Express pre-suit notification is a condition precedent, and the buyer has the burden of pleading (and proving) compliance. *Id.* Here, Plaintiffs do not plead or argue that they have satisfied their pre-suit notice requirement imposed by the UCC and waived their right to seek any remedy arising from their purchases. *See* Unif. Comm. Code § 2-207 cmt. 7 ("In many cases, as where goods are … accepted and paid for before any dispute arises, there is no question whether a contract has been made.").

Further, a breach of contract requires "(1) the existence of a contract; (2) a breach of a duty imposed by the contract; and (3) damages." *Abdul-Rahman v. Chase Home Fin. Co., LLC*, 2014 WL 3408564, at *2 (E.D. Pa. July 11, 2014). "Resultant damages" are those "damages suffered from the breach." *412 N. Front St. Assocs., LP v. Spector Gadon & Rosen, P.C.*, 151 A.3d. 646, 657 (Pa. Super. 2016). Here, "Plaintiffs' breach of contract claim fails because they have not identified the term of the contract that was actually breached." *Thomas*, 2011 WL 2415157, at *9.

To the extent that Plaintiffs claim a breach of their purchase-and-sale agreements for food

from Chipotle, the evidence establishes the existence of either: (a) modifications to the respective agreements; or (b) waivers by Plaintiffs of any contractual right to recovery. First, a mere modification in the terms of an agreement is not a breach. "A contract can be modified with the assent of both contracting parties if the modification is supported by consideration." *Mikail v. PAM Mgmt., Inc.*, 2017 WL 1344676, at *12 (M.D. Pa. Apr. 12, 2017). "Modification of a contract may be demonstrated by words, conduct, or both." *Trombetta v. Raymond James Fin. Servs., Inc.,* 907 A.2d 550, 558 (Pa. Super. 2006). "The acts of parties, their conduct, and the circumstances and relations existing between them, are all elements to be given due consideration in determining both the existence and terms of [a modification]." *Burge v. W. Pa. Higher Educ. Council, Inc.,* 391 Pa. Super. 108, 111–12 (1990). Similarly, Pennsylvania law allows individuals to waive any provision in a contract that has been established for one's benefit. *Formigli Corp. v. Fox*, 348 F. Supp. 629 (E.D. Pa. 1972). "To constitute a waiver of a legal right there must be a clear, unequivocal and decisive act of the party with knowledge of such right and an evident purpose to surrender it." *Exxon Corp. v. Shover*, 71 Pa. D. & C.2d 237, 244 (Pa. Com. Pl. 1974) (citing *Transnat'l Cons. Disc. Co. v. Kefaver*, 224 Pa. Super. 475, 479 (1973)).

The undisputed evidence of the circumstances surrounding Plaintiffs' respective purchase transactions establishes either of these scenarios as a matter of law. In their Complaint, Plaintiffs make no effort to articulate the nature or terms of this "agreement" of Chipotle with its customers. They apparently contend that a binding contract for the sale of goods is formed at the precise moment a customer orders food at a Chipotle restaurant in each and every instance. No matter how Plaintiffs choose to characterize the legal phases of contract formation with respect to ordering and purchasing food from a fast-casual, quick service restaurant, Plaintiffs' contract claims premised on receiving less change can have no merit. If a contract had not yet been formed until the

consummation of the purchase, then Plaintiffs accepted a counteroffer. *See* 13 Pa. Cons. Stat. § 2207. If a contract was formed before consummation of the transaction, then Plaintiffs accepted a modification, or if modification was unsuccessful, effected a waiver. *See id.* § 2209. Here, the parties' conduct demonstrated a modification of the terms, a consent to modify the terms, and an acceptance of the new terms when Plaintiffs completed the transactions and left with their food without objection.

Finally, for the same reasons that Plaintiffs cannot show causation for their UTPCPL claims, they cannot show that any alleged breach of contract directly caused their claimed damages of $0.49 and $0.45. Although Plaintiffs had every opportunity to use a different form of payment, decline to go through with their transactions, or show their opposition in any other way, their conduct clearly disclaimed such opportunity. These realities dispense with the notion of any colorable contract claim.

## **CONCLUSION**

For the foregoing reasons, Chipotle respectfully requests that the Court GRANT its Motion for Summary Judgement and DISMISS all of Plaintiffs' claims with prejudice.

Dated: October 13, 2023

/s/ Betsy Bulat
Betsy Bulat (admitted *pro hac vice*)
Bar I.D. GA 558428
Robert J. Mollohan, Jr. (admitted *pro hac vice*)
Bar I.D. GA 984253
Maya S. Marshall
Bar I.D. GA 596066 (*pro hac vice* application
forthcoming)
MARTENSON, HASBROUCK & SIMON LLP
2573 Apple Valley Road NE
Atlanta, GA 30319
Telephone: (404) 909-8100
bbulat@martensonlaw.com
rmollohan@martensonlaw.com
mmarshall@martensonlaw.com

-and-

Derek J. Illar
Bar I.D. PA 307492
ECKERT SEAMANS CHERIN & MELLOTT, LLC
600 Grant Street, 44th Floor
Pittsburgh, PA  15219
Telephone: (412) 566-2105
dillar@eckertseamans.com

*Attorneys for Defendant Chipotle Mexican Grill, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on October 13, 2023, the foregoing **DEFENDANT'S MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGEMENT** has been sent via ECF notice to Plaintiffs' counsel:

Frank G. Salpietro, Esq.
William F. Ward, Esq.
Rothman Gordon, P.C.
310 Grant Street - Third Floor
Pittsburgh, PA 15219
(412) 338-1185 (telephone)
(412) 246-1785 (facsimile)
fgsalpietro@rothmangordon.com
wfward@rothmangordon.com


*/s/Betsy Bulat*
Betsy Bulat
MARTENSON, HASBROUCK & SIMON LLP
2573 Apple Valley Road NE
Atlanta, GA  30319
Tel.: (404) 909-8100
bbulat@martensonlaw.com